IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.                          CRIMINAL NO. 2:22-cr-00097

RANDY PRICE

**RESPONSE OF THE UNITED STATES IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Defendant Randy Price ("Price") has filed a motion to dismiss the indictment. *See* ECF 12. The defendant does not dispute any of the facts alleged in the indictment. He argues the indictment charging him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and of possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) is unconstitutional after the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, ---U.S.---, 142 S. Ct. 2111 (2022).

Price's claim regarding the § 922(g)(1) charges fails because the Second Amendment's protections do not extend to the possession of firearms by convicted felons. Price's claim regarding the § 922(k) charge also fails because while the Second Amendment protects the right to keep and bear arms, prior Supreme Court precedent does not cast doubt on laws imposing conditions and qualifications on the commercial sale of arms, including a prohibition of the obliteration of serial numbers. Even if the aforementioned statutes did regulate protected conduct, they would still be constitutional because both are consistent with the nation's historical tradition of firearm regulation. Thus, Price's motion to dismiss should be denied.

I.   **LEGAL BACKGROUND**

   a. **Statutory Regulations on Firearm Possession**

Section 922(g)(1) makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). Section 922(k) proscribes for "any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(k).

The federal prohibition in § 922(g) has existed in some form since 1938, when Congress first limited gun access by convicted felons. *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011); *see United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (noting "first federal statute disqualifying felons from possessing firearms was not enacted until 1938"). The original federal prohibition reached only those under indictment for or convicted of crimes of violence. *Laurent*, 861 F. Supp. 2d at 82 (citing Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed)). In 1961, Congress expanded the prohibitions to include those convicted of all crimes. *Id.* at 83. Congress later passed the Gun Control Act of 1968, which added restrictions on those under felony indictment and maintained the prohibition related to convicted felons. *Id.* "In 1986, Congress again revised the statute to combine the provisions of

2

§ 922(g)(1) and (h)(1) that dealt with indictees into a single section, § 922(n)." *Id.* at 84. The statutory text has not substantively changed since then.

### b. The Second Amendment

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626.[1] It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* *Heller* made clear that the opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications

---

[1] *See also Bruen*, 142 S.Ct. at 2128 (quoting Heller, 554 U.S. at 626). Supporting this, the Justices who made up the majority understood the opinion to "decide[] nothing about who may lawfully possess a firearm." *Id*. at 2157 (Alito, J., concurring); *see also id*. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations.") (citing *Heller*, 554 U.S. at 636); *id*. ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . [which are] only examples [and] . . . does not purport to be exhaustive." (quoting *Heller*, 554 U.S. at 626–27 & n.26; *citing McDonald v. Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion)).

on the commercial sale of arms." *Id.* at 626-27; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010). *Heller* described these regulations as "presumptively lawful" measures. 554 U.S. at 627 n.26.

In *Bruen*, the Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S.Ct. at 2134. It elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. Only after the government makes that showing "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130.

Applying that standard, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving "proper cause exists." *Id.* at 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134.[2] This, the Court concluded, fell within "the right to keep and bear arms." *Id.*

---

[2] That the individuals were "law-abiding," but still required to demonstrate a special need appears to have been the Supreme Court's primary issue with the New York law. *See generally, id*. Here, however, no such issue exists because a person convicted for a misdemeanor crime of domestic violence is, by definition, not law-abiding. *See also United States v. Daniels*, --- F. Supp. 3d ---, 2022 WL 2654232, at *2 (D. Miss. July 8, 2022) ("Because it is concerned with 'unlawful' drug users and addicts, there is some doubt that section 922(g)(3) is textually covered by the Second Amendment, insofar as it has been interpreted to guarantee the right to keep and bear arms to ordinary, law-abiding, responsible citizens concerned with self-defense.").

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

*Bruen* rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of gun regulations. *Id.* at 2127. But it did not, as Price claims, invalidate § 922(g)(1) and § 922(k). Nor did it entirely abrogate the Fourth Circuit's post-*Heller* Second Amendment precedent. After *Heller*, the Fourth Circuit explained that the first question when addressing a Second Amendment claim "is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," a "historical inquiry seek[ing] to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), *abrogated on other grounds by Bruen*, 142 S.Ct. 2111 (quotation marks omitted). *Bruen* described such an inquiry as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 142 S.Ct. at 2127. It did not undermine the Fourth Circuit's earlier analysis of the historical tradition of firearms regulations. As explained below, a review of that history and of Fourth Circuit precedent compels the conclusion that § 922(g)(1) and § 922(k) are constitutional.

## II. SECTIONS § 922(g)(1) AND § 922(k) ARE CONSTITUTIONAL.

Price argues § 922(g)(1) and § 922(k) are facially unconstitutional because their prohibitions are not deeply rooted in this country's history. ECF No. 12 at 13. He faces a heavy burden: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Sections § 922(g)(1) and § 922(k) both proscribe conduct outside the scope of the Second Amendment, and both are sufficiently analogous to historical regulations to be deemed longstanding. Both are constitutional, and Price's motion to dismiss should be denied.

### A. Price's motion to dismiss the § 922(g)(1) charges should be denied because the Second Amendment does not extend to the possession of firearms by convicted felons.

Price's facial challenge to the constitutionality of § 922(g)(1) is without merit. First, Price cannot show the Second Amendment right to keep and bear arms protects the prohibited conduct: possessing a firearm as a convicted felon. Assuming he could, § 922(g)(1) would still be constitutional because the statute is consistent with the nation's historical tradition of disarming persons considered a risk to society. Price's motion to dismiss should be denied.

As noted above, *Heller* defined the right to bear arms as belonging to "law-abiding, responsible citizens." 554 U.S. at 635. Consistent with that definition, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id*. at 626. The Court described such prohibitions as "presumptively lawful" and falling within "exceptions" to the protected right to bear arms. *Id*. at 627 n.26, 635. In *McDonald*, a plurality of the Court repeated its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

6

*Bruen* reinforces the conclusion that the Second Amendment does not extend to possession of firearms by convicted felons. *See* 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional). *Bruen* repeatedly described the Second Amendment as limited to "law-abiding" citizens. 142 S.Ct. at 2122, 2131, 2133, 2134, 2138, 2150, 2156. Consistent with that principle, *Bruen* approved "'shall-issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course."[3] *Id*. at 2139 n.9; *see id*. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[.]"). In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. Such regimes generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *See id*. at 2139 n.9. This reasoning underscores that § 922(g)(1)—which aims to ensure that "those bearing arms" are "law-abiding, responsible citizens"—accords with the Second Amendment. *See id*.

As several courts of appeals have recognized, offenses serious enough to satisfy § 922(g)(1)—"crime[s] punishable by imprisonment for a term exceeding one year"—necessarily exclude the perpetrator from the class of law-abiding citizens protected by the Second Amendment. *See, e.g.*, *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (reaffirming the Fifth Circuit's pre-*Heller* jurisprudence holding "that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate" the Second Amendment). The Second Amendment permits Congress to

---

[3] A "shall issue" regime is one in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 142 S.Ct. at 2123. By contrast, a "may issue" regime vests "authorities [with] discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria." *Id*. at 2124.

disarm individuals based on their status as convicted felons. Section 922(g)(1) does not burden a constitutional right, and it is facially constitutional.[4]

Even if the Supreme Court had not already defined the Second Amendment in a way that excludes the right of convicted felons to possess firearms, Price's facial challenge still fails because § 922(g)(1) fits comfortably within the nation's longstanding tradition of disarming unvirtuous or dangerous citizens. As the Fourth Circuit has recognized, "[p]laced in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S.Ct. 2111. Indeed, "historical evidence support[s] the notion that government could disarm individuals who are not law-abiding members of the political community," such as convicted felons. *See United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012).[5]

For centuries, the gun rights of certain groups have been categorically limited to promote public safety. *Heller* identified the right protected by the 1689 English Bill of Rights as "the predecessor of our Second Amendment." 554 U.S. at 593. That document provided "[t]hat the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Both before

---

[4] A regulation *Heller* recognized as "presumptively lawful," like the felon-in-possession ban, "could not violate the Second Amendment unless, as applied, it proscribed conduct falling within the category of *law-abiding responsible* citizens using arms in defense of hearth and home." *United States v. Pruess*, 703 F.3d 242, 245 (4th Cir. 2012) (citing *Heller*, 544 U.S. at 635).

[5] Shortly after *Heller*, the Fourth Circuit noted in dictum, "it appears to us that the historical data is not conclusive on the question of whether the founding era understanding was that the Second Amendment did not apply to felons." *Chester*, 628 F.3d at 680. As demonstrated below, and as the court later acknowledged in *Carter* and *Carpio-Leon*, the historical evidence in fact establishes that dangerous persons have always been subject to limitations and prohibitions on their right to possess firearms.

and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous. See *Carpio-Leon*, 701 F.3d at 980.

Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).[6] The Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, Law & Contemp. Probs., Winter 1986 at 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting in parenthetical Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

As the Fourth Circuit has already recognized, "'[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm '"unvirtuous citizens."'" *Carpio-Leon*, 701 F.3d at 979–80 (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources). The court explained

---

[6] https://heinonline.org/HOL/Page?handle=hein.beal/tcl1868&id=1&collection=beal (accessed July 25, 2022).

that "felons 'were excluded from the right to arms' because they were deemed unvirtuous." *Carpio-Leon*, 701 F.3d at 980 (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).

Historical records support this conclusion. "*Heller* identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *Skoien*, 614 F.3d at 640 (quoting 554 U.S. at 604). That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *See id.* (emphasis added) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwartz, *The Bill of Rights* 674-75, 681 (emphasis added).[7] In the same vein, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime."[8] *Skoien*, 614 F.3d at 640. Put simply, as the Seventh Circuit has suggested, "felons were not historically understood to have Second Amendment rights." *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019), *abrogated on other grounds by Bruen*, 142 S.Ct. 2111.

---

[7] https://heinonline.org/HOL/Page?collection=beal&handle=hein.beal/blorhs0002&id=51&men_tab=srchresults (accessed July 25, 2022).

[8] Additionally, "several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Nat'l Rifle*, 700 F.3d at 200; *see also Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States").

In this respect, the right to bear arms is analogous to civic rights that have historically been subject to forfeiture by individuals convicted of crimes, including the right to vote, s*ee Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), and the right to serve on a jury, 28 U.S.C. § 1865(b)(5). *See Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 349 (3d Cir. 2016) (en banc) ("[P]ersons who have committed serious crimes forfeit the right to possess firearms in much the way 'they forfeit other civil liberties[.]'") (citation omitted). Just as Congress and the States have required persons convicted of felonies to forfeit civic rights, § 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring). Statutes disarming persons considered a risk to society, such as convicted felons, are well known to the American legal tradition. Section 922(g)(1) is consistent with that longstanding tradition. Price's claim that § 922(g)(1) unconstitutionally infringes on a Second Amendment right should be denied.

**B. Price's motion to dismiss the § 922(k) counts should be denied because *Heller* made clear that its ruling did not cast doubt on laws imposing conditions and qualifications on the commercial sale of arms.**

While the Second Amendment protects the right to keep and bear arms, *Heller* made clear that its ruling did not cast doubt on "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 627. Moreover, the essentially controlling concurrences in *Bruen* emphasized the narrow nature of the Court's holding and reiterated the above statement from *Heller*. As a textual matter, the Second Amendment demands that the right to keep and bear arms may not be "infringed"—not that the right *may not be burdened in any way*. The requirement of serial numbers on firearm does not "infringe" the right to keep and bear arms because it stops far short of disarming law-abiding citizens. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress"

11

and "[t]o destroy or hinder"); *see also United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) (noting that "the presence of a serial number does not impair the use or functioning of a weapon in any way," and therefore § 922(k)'s "burden on [a person's] ability to defend himself is arguably de minimis").

As such, under *Heller* and the plain text of the Constitution, the Second Amendment right to keep and bear arms for self-defense does not include a right to sell or transfer firearms with obliterated serial numbers. Even if § 922(k) burdened the Second Amendment right and the government must show that the statute is consistent with a historical tradition of firearms regulation, it can do so. *See* Section I, *supra*. There is a longstanding historical tradition of restricting the *types* of weapons that can be possessed by even law-abiding citizens. Section 922(k)'s restriction upon firearms with obliterated serial numbers is such a regulation and is accordingly supported by this history. In *Heller*, the Supreme Court acknowledged at least three limits on the types of weapons covered by the Second Amendment. First, the Court ruled that the Second Amendment, by its terms, applies only to "bearable arms"—that is, to arms that can be "carr[ied] upon the person." 554 U.S. at 582, 584.

Second, the Court acknowledged the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. For example, under English common law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone Commentaries. In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State* v. *Langford*, 3 Hawks 381, 383 (NC 1824).

Third, the Court reaffirmed its previous holding that the Second Amendment encompasses only arms "of the kind in common use." 554 U.S. at 624 (quoting *United States* v. *Miller*, 307 U.S. 174, 179 (1939)). The Court explained that the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." 554 U.S. at 624. The Court further explained that the common-use limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627.

Federal law also imposes a wide range of restrictions on commerce in firearms. For example, a person must obtain a federal license before engaging in the business of importing, manufacturing, or dealing in firearms. 18 U.S.C. § 922(a)(1)(A). A license-holder may not sell certain types of guns to a person who resides in a different state. *Id.* § 922(b)(3). A license-holder must also maintain records of its activities. *Id.* § 923(g). And under § 922(k), it is a crime to transport, ship, or receive a firearm with an obliterated serial number or to possess such a restricted firearm.

There is no serious question that the Second Amendment protects the right to buy and sell any and all weapons. The "right to keep arms, necessarily involves the right to purchase them." *Andrews*, 50 Tenn. at 178. And colonists objected when Great Britain embargoed the export of all arms and ammunition to the colonies in the 1770s. "The General Committee of South Carolina, for example, adopted a resolution in 1774 … observing that 'by the late prohibition of exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them." *Teixeira*, 873 F.3d at 668. The right to speak includes the right to buy advertisements (*Citizens United* v. *FEC*, 558 U.S. 310 (2010)), the right to counsel includes the right to buy the services of counsel (*Luis* v. *United States*,

13

136 S. Ct. 1083 (2016)), and the right to use contraceptives includes the right to buy them (*Carey* v. *Population Services, International*, 431 U.S. 678 (1977)). So too for the right to keep and bear arms.

Even so, there is a general historical practice of imposing "conditions and qualifications on the commercial sale of arms." 554 U.S. at 627. As already noted, "colonial governments substantially controlled the firearms trade." *Teixeira*, 873 F.3d at 685. For instance, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Spitzer, *Gun Law History*, 80 Law & Contemporary Problems at 74. In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id.* at 685 n.18 (emphasis added). And other colonies "controlled the conditions of trade" in firearms. *Id.* at 685.

States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. Spitzer, *Gun Law History*, 80 Law & Contemporary Problems at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and appointed a state inspector "to oversee or conduct the testing." *Ibid.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Ibid.*

Federal regulations placing requirements upon the sale of firearms are thus firmly rooted in history, as such requirements impose only a "condition" or "qualification" on the manufacture or sale of arms. These regulations leave open ample opportunities for people who wish to buy and possess arms to do so. The requirement that unaltered serial numbers are required in order to sell,

14

receive, or possess firearms is just such a "condition" that does not violate the Second Amendment. Accordingly, Price's motion to dismiss the § 922(k) charge must be denied.

### III. CONCLUSION

*Heller* and *Bruen* are clear that the Second Amendment protects possession and use of firearms for lawful purposes by law-abiding, responsible citizens. The Constitution does not protect the conduct § 922(g)(1) and § 922(k) prohibit: possessing a firearm as a convicted felon and possessing a firearm with an obliterated serial number. Moreover, even if such conduct were covered, both statutes are consistent with the nation's historical tradition of firearm regulation. Both are facially constitutional, and Price's motion to dismiss should be denied.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

By: */s/ Negar M. Kordestani*
NEGAR M. KORDESTANI
Assistant United States Attorney
West Virginia Bar No. 13784
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: negar.kordestani@usdoj.gov

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "RESPONSE OF THE UNITED STATES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS" has been electronically filed and service has been made on all counsel of record this the 15th day of August, 2022 upon:

>Lex Coleman, AFPD
>United States Courthouse, Room 3400
>300 Virginia Street East
>Charleston, West Virginia 25307

>/s/ Negar M. Kordestani
>NEGAR M. KORDESTANI
>Assistant United States Attorney
>WV Bar No. 13784
>300 Virginia Street, East
>Room 4000
>Charleston, WV 25301
>Telephone: 304-345-2200
>Fax: 304-347-5104
>Email: negar.kordestani@usdoj.gov