IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.  Case No. 2:22-cr-00097

RANDY PRICE

**DEFENDANT'S REPLY MEMORANDUM ON MOTION TO DISMISS**

Comes Randy Price, through his counsel, Senior Litigator AFPD Lex A. Coleman, and submits his reply to the United States' response to defendant's *Bruen*-based motion to dismiss. In further support of his motion, Mr. Price submits the following:

**1.** The Fourth Circuit and its various district courts have previously found Section 922(g)(1) to be constitutional post-*Heller*.[1] *See e.g. United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012)(application of felon-in-possession prohibition against non-vioilent felon did not violate Second Amendment); *United States v. Moore*, 666 F.3d 2313 (4th Cir. 2012)(… a presumptively lawful regulation could not violate the Second Amendment, unless, as applied, it proscribed conduct" fall[ing] within the category of … law-abiding responsible citizens … us[ing] arms in defense of hearth and home…); *United States v. Smoot*, 690 F.3d 215 (4th Cir. 2012); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)(discussing Section 922(g)(9) in context of felon disarmament under Section 922(g)(1)); *United States v. Davis*, 906 F.Supp.2d 545 (S.D.W.Va. 2012)(convicted felon cannot possess body armor); *United States v. Lunsford*, 2:10-cr-182, 2011 WL 145195

---

[1] There do not appear to be any Fourth Circuit cases making similar findings respecting 18 U.S.C. § 922(k).

(S.D.W.Va. Jan. 18, 2011). These cases consistently did so based on the law-abiding/virtuous citizen trigger for intermediate means-ends scrutiny, coupled with the *Heller* law-abiding citizen *dicta*, and then held the resulting firearm prohibition was a "reasonable fit" to the governmental interest in preventing convicted felons from possessing firearms. *Id*. *Bruen* now constitutes an intervening decision that relieves this Court of its obligation to follow those pre-*Bruen* Fourth Circuit Section 922(g)(1) authorities which are now contrary to *Bruen*'s Second Amendment textual and historical analysis. This Court should find as much in disposing of defendant's pending motion.

**2.** On July 16, 2019, the Charleston Police Department conducted a traffic stop on Mr. Price's vehicle for having "an improper display of registration". Through that stop, authorities found a Raven Arms MP-25 .25 caliber pistol with an obliterated serial number in the car. Price claimed that he had purchased the gun approximately one month prior to the stop in Wayne County, West Virginia. Price purportedly has a 1992 Ohio felony conviction for attempted aggravated burglary, and a 2002 Ohio felony conviction for involuntary manslaughter and aggravated robbery (where he was the driver of a vehicle, in which another occupant of which committed the actual homicide).

**3.** That being said, and based upon the belief that such matters are not disputed, the United States' response fails to establish the existence of a robust tradition of firearm regulation disarming convicted felons <u>at the time of the Founding</u>. Instead, the United States has actually expressly conceded that federal felon dispossession laws were not adopted in this country until the twentieth century – in 1938, or over 147 years after ratification of the Constitution, and 146 years after the first Congress adopted and the

then existing fifteen states ratified the Bill of Rights. *See* Dkt. No. 17, at 2. Rather than directly address and apply *Bruen*'s refined Second Amendment standard of review to § 922(g)(1) or (k), the United States has doubled down on Mr. Price being too unvirtuous, and too imperfect to warrant protections afforded by the Second Amendment. *See* Dkt. No. 17, at 6-11. The United States incorrectly asserts that the law-abiding, virtuous citizen criteria is applicable to the first *Bruen* prong of whether certain conduct is subject to Second Amendment protections.

  **4.** The government goes all in on the pre-*Bruen* law-abiding citizen construct – trying to resuscitate a key mechanism of the means-end scrutiny analysis *Bruen* expressly rejected. More importantly, the United States tries to sell the manifestly false premise that neither *Bruen*, *Heller*, or the text of the Second Amendment support – which is that Second Amendment protections <u>only</u> apply to law-abiding citizens. *See* Dkt. No. 17, at 6-11. The text of the Second Amendment does not say that. Even accepting that "the right secured by the Second Amendment is not unlimited," the government's assertion is simply not the law.

  **5.** The post-*Heller* law-abiding citizen construct was adopted by Courts of Appeals as a way to get around using strict scrutiny to analyze Second Amendment challenges (*Heller* had expressly rejected rational basis review). It was a mechanism justifying resort to a less precise intermediate means-ends scrutiny of the fit between a given governmental interest and the permanent disarming of certain categories of American citizens. Resort to intermediate scrutiny had the practical effect of maintaining the status quo post-*Heller* - with Courts "assuming, but not finding" in every single case that Second Amendment protections applied, but that a given gun regulation was a "good enough" fit

to justify continuing to disarm categories of citizens. As the dust settled after *McDonald*, wholesale resort to intermediate scrutiny ensured that most pre-*Heller* federal firearm regulations remained completely intact.

**6.** The "law-abiding and responsible citizen" filter was an integral and inseparable component of the post-*Heller* Second Amendment means-end scrutiny analysis – but only because the courts made it so. It was never a requirement placed on Second Amendment protections by the Amendment's actual text, nor was it a <u>requirement</u> expressly created by *Heller*. This was in no way changed by the *Bruen* majority opinion referring to "law-abiding responsible citizens" (which is how the litigants briefed that case) – whether it was ten times or ten thousand. Neither does the Minority Convention of the State of Pennsylvania warrant such an interpretation, which was ultimately rejected by the Pennsylvania legislature.

**7.** *Bruen* got rid of means-ends scrutiny analysis in the Second Amendment context, and with it – artificially constraining "core" fundamental Second Amendment protections to only perfect, sinless, law-abiding citizens. *Bruen*'s first prong does not focus on how good and deserving a given citizen has been (almost twenty years in the past, or presently) to enjoy Second Amendment protections. The inquiry instead focuses solely on conduct, and whether the particular conduct at issue is subject Second Amendment protections. Justice Thomas' majority opinion repeatedly emphasizes the particular <u>conduct</u> at issue, and not who is engaging in it, as being central to the <u>first</u> *Bruen* prong of whether Second Amendment protections apply. Whether the Second Amendment's presumptive application can be prohibited based on who someone is or what they have done - <u>then</u> becomes a function of the <u>second</u> *Bruen* prong, within the historical analysis

the United States now has the burden of carrying. Movant submits that the United States has not carried it's burden with respect to 18 U.S.C. § 922(g)(1) or (k). Instead, it remains undisputed that - at the time of the Founding – convicted felons were simply not disarmed in the United States – nor were individual citizens disarmed or jailed if they possessed firearms without any manufacturer's serial number. The problem or "risk" presented by convicted felons possessing arms existed before, during, and after the time of the Founding – and yet felons (and a limited number depending on the types of convictions) were not disarmed in the United States until 1938. Similarly, the "risks" associated with citizens possessing firearms without manufacturer's serial numbers existed before, during and after the time of the Founding, yet there is no pre-Twentieth Century tradition of disarming citizens who owned or otherwise possessed firearms without any manufacturer's serial number. There similarly are no comparable analogues addressing changed circumstances since the Founding that would constitute a robust tradition capable of overcoming the presumption of unconstitutionality running to the disarmament of felons or citizens possessing unmarked firearms.

8. Randy Price's <u>conduct</u> falls within the plain text of the Second Amendment. There is no dispute the single firearm seized from Price's vehicle was an "arm" for Second Amendment purposes. Possessing a firearm outside the home and inside one's vehicle for purposes of self-defense is also core Second Amendment conduct that qualifies as "keeping" arms.

9. Mr. Price is included as one of "the people" under the Second Amendment. *Heller* said the term "the people" unambiguously refers to all members of the political community, "not an unspecified subset." *Heller* has also said "the people" is a "term of

art" that has a uniform meaning in the First, Second, Fourth, and Ninth Amendments. It "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller* further said the right protected by the Second Amendment "belongs to all Americans." Despite his past convictions, Mr. Price is undoubtedly part of the "national community," just as he is part of "all Americans." Were he excluded, that would mean "the people" as used in the Second Amendment refers to "an unspecified subset" of people – a proposition *Heller* rejected. If the government is correct that breaking the law strips citizens of their Second Amendment rights, then breaking the law would also strip citizens of their First and Fourth Amendment rights. Yet convicted felons or citizens who possess guns with obliterated serial numbers do not lose their rights to free speech or against unlawful searches and seizures. So Price, along with his conduct, both fall within the plain text of the Second Amendment – such that his conduct is presumptively protected by the Constitution. *See e.g United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022)(even "dangerous felons" are indisputably part of "the people"); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015). *United States v. Jackson,* which has been cited by the United States in other cases, fully supports defendant's position that the Second Amendment does not only apply to law abiding citizens. *See* Case No. CR-22-59-D (W.D. Okl. Aug. 19, 2022), 2022 U.S. Dist. LEXIS 148911, * 2 & n.2.

    10.    The Second Amendment's "plain text" does not differentiate between

convicted felons, and other members of "the people," and a total prohibition on firearm possession by convicted felons therefore presumptively violates the Second Amendment.

**11.** To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]"). This point is where *Jackson*'s analysis falls short.

The *Bruen* Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition"

for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[2] Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides

---

[2] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

Page **8** of **14**

"confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

12. The Court in *Bruen* further held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow. The Court said, for instance, that "[i]n some cases," the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

Page **9** of **14**

In "other cases," challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding"). Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

The Court also stressed the <u>limits</u> of reasoning by analogy:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the

> government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* (emphasis in original).

**13.** Whether based on "distinctly similar" precursors or merely historical analogues, the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well-established and representative" historical analogue); *id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic"). A handful of "outlier" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-Century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws—which were closest to New York's—as unrepresentative. *See id.* at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced [those] laws").

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical

tradition of firearm regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2130; *see also, e.g.*, *id.* at 2141 n.11 ("But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope."). Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

14. What is today Section 922(g)(1) (prohibiting the possession of traces its origins to 1938, when Congress passed the Federal Firearms Act, prohibiting certain type of felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended the statute to prohibit "possession by *all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing

Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus Section 922(g)(1) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24, a century and a half after adoption of the Second Amendment. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm" earlier practice. *Bruen*, 142 S. Ct. at 2137. Indeed, in *Bruen* the Court said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

**15.** Felon-disarmament laws were simply unknown to the founding generation. There was no "historical tradition," in 1791, of barring felons from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted. 18 U.S.C. § 922(g)(1) was enacted as part of Pub. Law 90-618, Sec. 102, 82 Stat. 1213, 1220 – effective October 22, <u>1968</u> (further amending Chapter 44 of Title 18 as part of the second version of the 1968 Gun Control Act). As a consequence, the United States cannot carry its burden and make the necessary showing to rebut the presumption of unconstitutionality of 18 U.S.C. § 922(g)(1) under *Bruen*. Defendant's motion to dismiss should be granted, therefore, because § 922(g)(1) violates protections afforded by the Second Amendment.

Date:  August 30, 2022.   Respectfully submitted,

**RANDY PRICE**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

<u>s/ Lex A. Coleman</u>
Lex A. Coleman, WV Bar No. 10484
Senior Litigator, Assistant Federal Public Defender
300 Virginia Street, East, Room 3400
Charleston, West Virginia  25301
Telephone: (304) 347-3350
Facsimile:   (304) 347-3356
E-mail: lex_coleman@fd.org